Hawkins, J.,
delivered the opinion of the Court.
The complainant commenced an action of ejectment in the Circuit Court of Knox County against the defendant, for recovery of the tract of land containing twenty-five acres, and afterwards filed this bill, for the purpose of staying waste thereon pendente lite.
The ' answer of defendant, is filed as a cross bill. Complainant claims the land under a grant from the State of Tennessee, dated December 10th, 1824, for forty-five acres. Defendant alleges that prior to the date of *66 the grant, complainant and one John Murphey, and one Solomon Harmon, each owned a tract of land adjoining each other, in what was known as Hinds’ Valley, at the back of which, and between the same and the top of a ridge, known as Bearer Creek Ridge, lay a piece of vacant land which constituted a desirable appendage to their several farms, and it was agreed between them that complainant should enter the land and procure a grant in his own name, for the benefit of all; and in-pursuance of that agreement, complainant did enter and procure a .grant for the land, and at some time thereafter conveyed that portion of the same which lay back of Harmon’s farm to Harmon, but that the deed from Copeland to Harmon has been lost, or mislaid so that it cannot be found, and has never been registered^ that on the 28th of October, 1828, Harmon conveyed the land to one Cliburn, who, on the 13th of December,. 1838, conveyed to defendant, Murphey, and one Luttrel, a-tract of one hundred and twenty acres, embracing the tract alleged to have been conveyed by Copeland to Harmon, and by Harmon to Cliburn, and the same now in dispute; and on the 15th of September, 1854, Lut-trel conveyed his interest in the tract of one hundred and twenty acres, to defendant, Murphey. Defendant also charges, that Harmon and those claiming under their several deeds, and claiming the same as their own adversely, since 1828. Defendant asks that said deed, alleged to have been lost, be set up, and relies upon adverse possession of more than seven years,' as- a bar to complainant’s right.
Complainant, in his answer to the cross bill, denies that he made the agreement, as charged, concerning the *67 entering of the land, and procuring a grant therefor; but says, in substance, that he did propose to them to enter the land, having' heard some one else was about doing so, but that they declined, saying “they were not able, or in a fix to enter it,” but complainant could enter it for himself, and if they ever needed it, they could purchase it from him, if he had too much woodland attached to his farm. He also says, that said Murphey brought to him a deed for him to execute, purporting to convey to Harmon a portion of the tract, but that he refused to sign the deed, or if he signed it, refused to deliver it, because he was not willing to sell the boundary as specified in the deed; and denies that Harmon, or those claiming under him, have had adverse possession of the land for seven years before he brought his action of ejectment.
The grant to Copeland, and the deed from Harmon to Cliburn, and from Cliburn to Murphey & Luttrel, and from Luttrel to Murphey, are exhibited in the record.
Two questions are presented for our consideration: 1st. Has the defendant shown the fact of the execution, delivery and loss of the deed from Copeland to Harmon, so as to entitle him to have • the same set up. The charge is not based upon the knowledge of the complainant in the cross bill,, but upon information. The answer of Copeland, then, to say the least, is suspiciously equivocal; and taken together with all the circumstances in the case, leads us strongly to suspect that the charge is true; but that is not sufficient. The answer of Copeland substantially denies the execution and delivery of the deed. Only one witness has been exam, ined touching the existence of the paper — James M. *68 Murphey, — who proves, in substance, only, that his father, John Murphey, about 1850, handed to him a paper, stating to him at the time, that it was a deed for the disputed land; that it purported to be a deed from Copeland to Harmon for twenty-five acres [of land.] No attempt is made to prove the genuineness of the paper, or the fact of its execution, delivery or loss. In fact, ,the inference is, that although it may have been signed 'by Copeland, yet that it had never been delivered to Harmon, as it was still in the hands of John Murphey, ■Who, 'Copeland says, brought the deed to him to procure fits execution. The proof not only fails to show the 'fact 'of the loss of the deed, but it fails to show that any effort or search has been made to find it. ¥e are of the opinion, the proof is wholly insufficient to authorize a Court, in the face of our Statute of frauds .and Registration laws, to set up and give effect to the paper as a deed of conveyance from Copeland to Har,mon for the land in controversy. 2d. Has there been such an adverse possession of the land in controversy, as will vest the title thereto in the defendant, Murphy, and defeat the title of complainant, Copeland?
The proof shows that Cliburn, claimed the land, and ■ cut timber on it, from the date of his deed in 1828, up to 1888, when he conveyed to Murphy & Luttrel, that defendant Murphy has been living upon, and cultivating the original tract owned by Harmon, ever since the date of the purchase from Cliburn, claiming the entire tract within the calls of the deed, under the deed, as the land of himself and his co-tenant, Luttrel, up to the date of the conveyance from Luttrel to him, in 1854; since which time, he has claimed it as his *69 own, during the whole time from 1838, up. to the time the action of ejectment was commenced; he has been using the timber on the disputed land for firewood, fence rails, house logs, and, in short, for all the ordinary-purposes, to which timber is applied by farmers in this country; that during all the time, such claim, possession and use, by the defendant, has been open, notorious and continuous; that the land was in sight of complainant’s house, at which the 'felling of trees could be distinctly heard. About 1851-2, the whole tract claimed by defendant and Luttrel was surveyed for them according to the calls of their deed: Copeland and several other persons were along at the time the survey was being made. In running the line North, between the original tracts of Copeland and Harmon, the direction of the line was North 34 degrees West; at 180 poles, they come to the North-west corner of Copeland’s original tract. The deed from Cliburn to Murphey and Luttrel, calls to run from that corner North 31 degrees West 16 poles, to a stake; thence North 40 poles, to a stake. This line is across the tract granted to Copeland in 1824, and was run and marked during the making of said survey, in 1851-2.- When they reached the corner, at 180 poles, Copeland proposed to Luttrel to run straight forward up the ridge; Luttrel avowed his intention to run according to the calls in his deed, saying he had bought all the land embraced in the calls of his deed; that Cliburn, from whom he had bought, was good, and if Copeland had a right to any of the land, he could sue. After running 16 poles, 31 degrees West of North, Copeland again insisted they should run straight forward, saying, if they would, he *70 did not care how far they ran. Luttrel again avowed his determination to run according to his deed, and started from that point North. Copeland did not then dispute Luttrel’s right to run the ■ line, or the right of Murphey and Luttrel to the land; the only question in dispute was, where the dividing line should run, making a difference of two or three acres. Copeland then left, and went home; the line then run forms the eastern boundary of the land in dispute.
The proof ' shows, that after said line was run, Copeland claimed the land, aDd on two or three occasions, notified Murphey to cease cutting timber on it — the first of which was two or three years after the dividing line was run. There was no improvement on the land until two or three years after the suit was commenced, when defendant extended his fence a few panels upon the disputed tract. It is very apparent, from the allegations in the original arid cross bill, and answer of complainant to the cross bill and the proof, that the most of the disputed land was, at the time of the entry, and from that time down to the commenceihent of this litigation, covered with valuable timber, which constituted its principal source of value. These are all the facts deemed necessary to set out, and it only remains for us to apply them to the rule, already well settled, in order to arrive at a solution of the question now under consideration. “An entry by one man upon the land of another, is an ouster of the legal possession, or not, according to the intention with which it is done, and if made under claim and color of title, is an ousterThe question whether possession be actual and adverse, depends mainly upon the intention with which it is taken *71 and holden. There are, however, certain well-defined rules, by which the intention of the party is to be ascertained: “neither actual cultivation or residence is neces-ary to constitute actual possession, where the property is so situated as not to admit of any permanent useful improvements, and the continued claim of the party has been evidenced by public acts of ownership:’’ Ewing vs. Burnet, 11th Peters.
This was a case involving the title to a sand bank in the city of Cincinnati, which, the proof showed, would not admit of any permanent, useful improvement; and hence the better opinion seems to be, that the Court, in that case, only intended to announce that “neither actual cultivation or residence is necessary to constitute actual possession,” where the continued claim of the party has been evidenced by public acts of ownership — as, for instance, in cases like the one then before ,the Court. It is not believed that the Court, in that case, intended to hold, that in all cases where the property was so situated as not to admit of any permanent, useful improvement, actual cultivation or residence is necessary to constitute actual possession; nor do we believe, that, by fair interpretation, such a construction ean be given to the language.
The character of the possession, as before remarked, depends upon the intention, which may be as clearly shown by other means, as by erecting a house or building fences, frequently temporary in their character, and of little value, and erected only because of their supposed efficacy in showing an intention to possess the land; and when so shown, it becomes actual aud adverse, as if it were evidenced by cultivation or residence. “Pos *72 session of land is denoted by the exercise of acts of dominion over it — in making the ordinary use, and taking the ordinary profits, of which it is susceptible in its present state — such acts to be so repeated as to show that they are done in the character of owner, and not of an occasional trespasser:” Williams vs. Buchanan, 1 Jre. L. P., 540. And this Court held, in the case of West vs. Lanier, 9 Hum., 762, that an enclosure or residence on land, is not necessary, in order to constitute possession; but such use and occupation, as from its nature and character, it is susceptible, under a claim of ownership, will be an actual possession.
The possession of Copeland, under his grant, was constructive. The possession of Cliburn and Murphey of the land in controversy, as evidenced only by their deeds, was also only constructive, and each neutralized the other; hence, without more, Copeland’s being the eldest title, must prevail. To constitute actual possession, it is not necessary that the land should be reduced to the highest state of cultivation or improvement of which it may be susceptible, or that any improvement whatever, be made upon it, although it be susceptible of cultivation and improvement. It is sufficient, if, under an assurance of title purporting to convey an estate in fee, the party claiming the land exercise acts of dominion over it, “in making the ordinary use, and taking the ordinary profits, of which it is susceptible in its present state — such acts to be so repeated as to show they are done in the character of owner, and not of an occasional trespasser.”
In view of the whole case, and in accordance with these principles, we are of opinion, that defendant, Mur-phey, and those under whom he claims, have had such *73 adverse possession of the lands in controversy, for more than seven years before complainant brought his action of ejectment to recover the same.
It is -insisted, upon the part of the defendant, that, under the Act of 1852, which is substantially enacted in the Code, section 3231, the holder of the legal title might sue any one claiming an interest in the land; and, therefore, a right of action accrued the moment the claim was made, and if the holder of the legal title failed to sue within seven years, his right of recovery would be barred. We do not think so. It is unquestionably true, as a general rule, that the Statute of limitations begins to run as soon as there is a right of action, provided, there is a party capable of suing, a party subject to be sued, and a' Court of competent jurisdiction, in which the suit may' be instituted. But the provisions of the Act referred to, were not intended to enlarge or amplify the means by which titles to lands may be acquired or defeated; nor do they extend the right of action, on the one hand, or the liability, on the other. They operate, alone,|upon the remedy, in regulating or providing the means by which a right may be enforced. To hold the doctrine contended for, would make titles to real estate even more precarious than titles to personal property, and would place the owners of land at the mercy of every man, however remote his claim, who might see proper, accompanied with such possession as is in violation of the actual rights of another, to lay claim to the lands of another.
The decree of the Chancellor will be reversed — complainant’s bill dismissed; also, the action of ejectment, with costs.